UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

-----------------------------------------------------------------------X

JASON HAMILTON,

                                    Plaintiff,

              -against-

THE FEDERAL SAVINGS BANK and
CONSTANTINE FLOROPOULOS,

                                Defendants.

-----------------------------------------------------------------------X

**<u>MEMORANDUM & ORDER</u>**
21-cv-06852-JMA-SIL

**FILED**
**CLERK**

9/10/2024 2:06 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

Plaintiff Jason Hamilton ("Hamilton") brings this employment discrimination action against his former employer, Defendant The Federal Savings Bank ("TFSB") and one of its employees, Defendant Constantine Floropoulos ("Floropoulos"). Hamilton alleges that he faced a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 <u>et seq.</u> ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law, N.Y. Exec. Law § 290 <u>et seq.</u> ("NYSHRL"); and the Suffolk County Human Rights Law, Laws of Suffolk County, New York, Part III § 89–13 ("SCHRL"). Hamilton further alleges common-law claims of assault and battery against Floropoulos and TFSB. TFSB—and TFSB alone—now moves, under Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Hamilton's claims against it. For the below reasons, the Court GRANTS TFSB's motion for summary judgment on Hamilton's Title VII and Section 1981 claims. Hamilton is ORDERED TO SHOW CAUSE within 7 days of the entry of this Order why this Court should not decline to exercise supplemental jurisdiction over his NYSHRL hostile work environment claim against Floropoulos, his SCHRL hostile work environment claim against TFSB, and his common law assault and battery claims against TFSB and Floropoulos. <u>See</u> <u>Catzin v. Thank You & Good Luck</u>

Corp., 899 F.3d 77, 82, 86 (2d Cir. 2018) (emphasizing that declining to exercise supplemental jurisdiction sua sponte "without an opportunity to be heard is, at a minimum, bad practice in numerous contexts and is reversible error in others").

## I.    BACKGROUND

### A.    Factual Background[1]

TFSB is a federally chartered savings bank engaged in the residential mortgage loan business throughout the United States.  (TFSB 56.1 ¶ 9; Hamilton 56.1 ¶ 9.)  In September 2021, TFSB had around 45 loan production offices.  (TFSB 56.1 ¶ 10; Hamilton 56.1 ¶ 10.)  TFSB's Melville office sits in a four-story, multi-tenant office building.  (TFSB 56.1 ¶ 12; Hamilton 56.1 ¶ 12.)  TFSB rents Suite 407 on the fourth floor, which is a multi-tenant floor.  (TFSB 56.1 ¶ 12; Hamilton 56.1 ¶ 12.)

---

[1]    The Court recites the facts herein only to the extent necessary to adjudicate TFSB's motion for summary judgment.  The following facts are either undisputed or construed "in the light most favorable to the non-moving party."  Overton v. N.Y. State Div. of Military & Naval Affs., 373 F.3d 83, 89 (2d Cir. 2004).  As it must, the Court "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against" Hamilton, the part against "whom summary judgment is sought."  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  The facts set forth in this Opinion are drawn from the parties' Local Civil Rule 56.1 statements, the exhibits attached to the parties' submissions, and the parties' summary judgment briefs.  Specifically, the Court draws from Hamilton's amended complaint (ECF No. 30 ("Am. Compl."), TFSB's Local Civil Rule 56.1 Statement of Material Undisputed Facts (ECF No. 60 ("TFSB 56.1")), Hamilton's Response to TFSB's Local Civil Rule 56.1 Statement and Statement of Additional Material Facts pursuant to Local Civil Rule 56.1(b) (ECF. No. 62 ("Hamilton 56.1")), Hamilton's First Deposition Transcript (ECF No. 60-2 ("Hamilton First Dep. Tr.")), Constantine Floropoulos's Deposition Transcript (ECF No. 60-3 ("Floropoulos Dep. Tr.")), Neil Bader's Deposition Transcript (ECF No. 60-4 ("Bader Dep. Tr.")), Hamilton's Second Deposition Transcript (ECF No. 60-5 ("Hamilton Second Dep. Tr.")), John Calk's Deposition Transcript (ECF No. 60-5 ("Calk Dep. Tr.")), Hamilton's Declaration (ECF No. 61-2 ("Hamilton Decl.")), TFSB's Brief in Support of its Motion for Summary Judgment (ECF No. 59 ("TFSB's Br.")), Hamilton's Opposition Brief (ECF No. 61 ("Hamilton Opp.")), and TFSB's Reply Brief (ECF No. 63 ("TFSB's Rep. Br.")).  Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.

On a motion for summary judgment, "the Court's consideration is limited to factual material that would be admissible in evidence at the trial."  Local Unions 20 v. United Bhd. of Carpenters & Joiners of Am., 223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002).  "Each numbered paragraph in the statement of material facts . . . will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civil Rule 56.1(c); see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).  Factual allegations that are not disputed are deemed admitted, as long as they are also supported by the record.  See id.  The Court disregards any arguments in the Rule 56.1 statements.  See Fernandez v. Wenig Saltiel LLP, 2024 WL 1345645, at *1 n.2 (E.D.N.Y. Mar. 29, 2024).

Hamilton, who identifies as a black and bisexual male, began working for TFSB as Mortgage Banker Assistant on July 25, 2016, at its Melville office.  (TFSB 56.1 ¶¶ 1, 19; Hamilton 56.1 ¶¶ 1, 19.)  During the entire time Hamilton worked for TFSB—from July 25, 2016 until March 21, 2022—he worked either in TFSB's Melville loan production office or for TFSB's Melville office remotely from his home.  (TFSB 56.1 ¶¶ 1, 11; Hamilton 56.1 ¶¶ 1, 11.)

Several months before Hamilton's hiring in April 2016, TFSB hired Floropoulos (a white male) as a Vice President in TFSB's Melville office.  (Floropoulos Dep. Tr. 14:7–16.)  Hamilton maintains that his interactions with Floropoulos were largely negative from the start, as Floropoulos had a crude personality.  (Hamilton Dep. Tr. 34:10–21.)  According to Hamilton, on one occasion prior the central incident of this action, Floropoulos interrupted Hamilton's conversation with several of co-workers by calling him a "retard."[2]  (Hamilton Dep. Tr. 15:10–16:24.)  But for the first five years and two months of Hamilton's employment with TFSB—from July 25, 2016 to September 22, 2021—Hamilton never heard Floropoulos use a racial slur, and TFSB management never received any report of inappropriate behavior by Floropoulos.  (TFSB 56.1 ¶ 13; Hamilton 56.1 ¶ 13.)

In the evening of September 22, 2021, after working in TFSB's Melville office that day, Hamilton punched out at 6:06 p.m.  (TFSB 56.1 ¶ 15; Hamilton 56.1 ¶ 15.)  After punching out, Hamilton left TFSB's fourth floor office suit and took the elevator down to the building's lobby.[3]  (TFSB 56.1 ¶ 15; Hamilton 56.1 ¶ 15.)  Hamilton maintains that, as he stepped out of the elevator, Floropoulos entered the same elevator to go up to TFSB's office suite.  (Hamilton Decl. ¶ 3.)

---

[2]    TFSB maintains that: "For the first 5 years and 2 months of his employment with TFSB (i.e., from July 25, 2016 to September 22, 2021), Hamilton never experienced any form of workplace discrimination against himself, never witnessed any other person experiencing any form of workplace discrimination, and did not consider his workplace environment to be hostile."  (TFSB 56.1 ¶¶ 2–3.)

[3]    Indeed, no part of the following incident took place in TFSB's office suite or on the same floor where TFSB's office suite is located.  (TFSB 56.1 ¶ 17; Hamilton 56.1 ¶ 17.)

Hamilton further maintains that Floropoulos said "hey nigga" to him while they were briefly in the elevator together.  (Hamilton Dep. Tr. 42:12–21.)   Shocked by Floropoulos's comment, Hamilton contends he tried to diffuse the situation by laughing and continuing leave the building. (Hamilton Dep. Tr. 43:23–44:11.)  Floropoulos then partially exited the elevator, held the door open, and began to berate Hamilton about his manner of dress.[4]  (TFSB 56.1 ¶ 18; Hamilton 56.1 ¶ 18.)  After stepping out of the elevator and following Hamilton, Floropoulos purportedly continued to attack Hamilton—yelling at him as he walked away.  (Hamilton Decl. ¶ 5.)  Although Floropoulos initially took a few steps back towards the elevator, Hamilton contends Floropoulos followed him out of the building as he attempted to leave.[5]  (Hamilton Decl. ¶ 5.)  As Hamilton continued to walk away, Floropoulos allegedly attempted to grab Hamilton as he stepped out the door of the building.  (Hamilton Decl. ¶ 6.)  Just outside the building, Floropoulos allegedly followed Hamilton, pushed him several times, and threatened to "slap the shit out of" him. (Hamilton Decl. ¶ 7.)  Hamilton maintains Floropoulos further prevented him from re-entering the building by stepping between Hamilton and the door.  (Hamilton Decl. ¶ 8.)  Hamilton maintains he continued to walk away from Floropoulos, who tailed behind him as he paced around on the other side of the doors.  (Hamilton Decl. ¶ 8.)  As a result, Hamilton started recording on his phone. (Hamilton Decl. ¶ 9.)

In his very first words on the recording, Floropoulos told Hamilton he was "going home" the next time he went to work in sneakers, jeans, and a t-shirt.  (Ex. G at 0:00–0:03 ("Audio-Visual Recording").)  Hamilton asked Floropoulos if he was okay, to which Floropoulos responded: "I'm on a different level," and repeatedly told Hamilton to "get on [his] level."  (Audio-Visual

---

[4]     TFSB maintains that the entire interaction consisted of Floropoulos berating Hamilton for wearing jeans, a t-shirt, and sneakers to work, and it denies Floropoulos ever said "hey nigga" to Hamilton.  (TFSB 56.1 ¶ 18)

[5]     TFSB tells a simpler—but not contradictory—story, stating: "In the lobby, Hamilton encountered Floropoulos, and then two of them had an interaction that began in the lobby and then continued as Hamilton and Floropoulos moved outside to the parking lot."  (TFSB 56.1 ¶ 16; Hamilton 56.1 ¶ 16.)

Recording at 0:05–0:16.)  Hamilton then asked Floropoulos to get away from him.  (Audio-Visual Recording at 0:17–0:18.)  After Floropoulos allegedly made physical contact with Hamilton and Hamilton told Floropoulos to "stop touching me," Floropoulos screamed: "suck my fucking dick." (Audio-Visual Recording at 0:29–0:34.)  Floropoulos continued: "you're a fucking piker.  You don't belong here [at TFSB].  Step up or get the fuck out of here . . . Your shit . . . we don't want this shit."  (Audio-Visual Recording at 0:39–0:51.)  Going on, without interruption, Floropoulos yelled: "you're a piker . . . I'm at $700,000 year to date . . . you're at fucking piker shit."  (Audio-Visual Recording at 1:02–1:14.)

Notwithstanding the intervention of the building security guard, Floropoulos kept following Hamilton, screaming at him: "suck a dick, you fucking faggot.  Fuck you.  Suck a dick. You're a faggot.  I told you once.  I told you twice.  Don't wear that shit to the office.  Yo, seriously. Don't wear that shit to the office.  Keep wearing those button downs and slacks.  That's what I want to see.  Keep doing that and get paid your, what, your what forty g's, thirty-five, forty g's cause you're a fucking piker … stay a fucking midget, dressed like a midget."  (Audio-Visual Recording at 1:39–2:10.)  Following this about five-minute exchange, Floropoulos walked back into the building.  (Hamilton Decl. ¶ 11.)  Hamilton never told anyone at TFSB that he is bisexual, and Floropoulos did not know that Hamilton was bisexual on September 22, 2021.[6]  (TFSB 56.1 ¶¶ 21–22; Hamilton 56.1 ¶¶ 21–22.)

The same evening that the incident took place, Hamilton reported the incident to Shawn Carson (his immediate supervisor) and to Jerry Willard (the head of TFSB's Melville office). (TFSB 56.1 ¶ 32; Hamilton 56.1 ¶ 32.)  Neil Bader—TFSB's Northeast Regional Senior Vice

---

[6]      TFSB maintains that "[t]he September 22, 2021 incident between Hamilton and Floropoulos was not based, in whole or in part on Hamilton's race or sexual orientation."  (TFSB 56.1 ¶ 23.)  Rather, TFSB maintains that "[t]he interaction consisted of Floropoulos berating Hamilton for wearing jeans, a t-shirt, and sneakers to work."  (TFSB 56.1 ¶ 18.)  Hamilton disputes both claims, noting that Floropoulos called him a "nigga, faggot, midget, piker, and [told him] to 'suck my fucking dick.'"  (Hamilton 56.1 ¶¶ 18, 23.)

President—also quickly became involved.[7]   (TFSB 56.1 ¶ 33; Hamilton 56.1 ¶ 33.)   Before the workday began the following morning (September 23, 2021), TFSB (1) arranged for Floropoulos to be absent from the office so that Hamilton would not have to interact with him; and (2) informed Hamilton of that fact.   (TFSB 56.1 ¶ 34.)   Willard, however, directed Floropoulos to contact Hamilton on the morning of September 23, 2021, which he did by phone and text.   (Hamilton 56.1 ¶ 34.)   TFSB also arranged for a video interview of Hamilton by Bader and John Calk—who was (1) the bank's Chairman and CEO (with authority over all the bank's around 45 loan production offices); and (2) the head of the bank's Human Resources Department.   (TFSB 56.1 ¶¶ 35–36; Hamilton 56.1 ¶¶ 35–36.)

During the week following the September 22, 2021 incident, TFSB conducted an investigation that included Calk and Bader reviewing the audio-visual recording Hamilton made of most of the encounter, Willard reviewing footage from the building's security video camera, and Calk and Bader interviewing Hamilton and Floropoulos.   (TFSB 56.1 ¶ 37; Hamilton 56.1 ¶ 37.)   On September 27, 2021, Hamilton met virtually—for about 24 minutes—with Bader and Calk to once more relay his complaint and to describe how he felt at work.[8]   (Hamilton 56.1 ¶ 38.)

Following Hamilton's meeting with Bader and Calk, Hamilton was called into a meeting with Bader and Willard in Willard's office.   (Hamilton Dep. Tr. 26:14–27:21.)   At that meeting, Bader relayed a four-step process for Floropoulos's punishment—which did not include Floropoulos losing his job.   (Hamilton Dep. Tr. 27:16–28:9.)   Bader, who testified that Floropoulos

---

[7]      On September 23, 2021, Hamilton sent the recording he took with his phone to Willard, Carson, and Bader. (Ex. L, ECF No. 61-11.)  Hamilton also met with the police to file a criminal complaint against Floropoulos, and the police encouraged Hamilton to obtain a copy of the security camera footage from the building.  (Hamilton Decl. ¶¶ 12–13.)  Hamilton maintains building management refused to provide him with the actual recording but allowed him to take his own video of the footage, which Hamilton subsequently gave to TFSB.  (Hamilton Decl. ¶ 14.)

[8]      TFSB maintains the meeting was about forty minutes long.  (TFSB 56.1 ¶ 38.)

is a "great guy," allegedly told Hamilton that he was liable for what occurred because Floropoulos was a manager at TFSB.  (Hamilton Dep. Tr. 28:10–29:23; Bader Dep. Tr. 77:14.)

Following its investigation, TFSB concluded that Floropoulos had acted improperly (though not discriminatorily) and, by September 30, 2021—just 8 days after the incident—TFSB decided Floropoulos's discipline and informed both Hamilton and Floropoulos of its decision. (TFSB 56.1 ¶ 39.)  Although TFSB considered terminating Floropoulos's employment, it decided against immediate termination.[9]  (TFSB 56.1 ¶ 40; Hamilton 56.1 ¶ 40.)  The discipline TFSB imposed on Floropoulos, which was set forth in a written disciplinary memorandum that Floropoulos needed to sign, consisted of (1) banning him from the office for several months—despite TFSB's policy that employees needed to work in person three days per week; (2) requiring him, at his own expense, to enroll in and complete an anger management course; (3) requiring him to apologize to the entire Melville office; and (4) requiring him to acknowledge, in the written disciplinary memorandum, that any further incident of a similar type would result in the immediate termination of his employment.  (TFSB 56.1 ¶ 41.)  Despite Floropoulos's punishment, TFSB awarded him for his 2021 performance—naming him to the "Chairman's Club" and gifting him a five-day, company paid trip to Peru.  (Floropoulos Dep. Tr. 36:2–10; 36:24–37:11.)

Floropoulos completed each of the items required of him as stated in the disciplinary memorandum. (TFSB 56.1 ¶ 42; Hamilton 56.1 ¶ 42.)  Floropoulos was also instructed that, when he was finally allowed back into the office several months later, he needed to enter and leave by the back door of the office suite so that there would be no encounters between Floropoulos and Hamilton.  (TFSB 56.1 ¶ 43; Hamilton 56.1 ¶ 43.)  Hamilton was informed that this requirement

---

[9]      TFSB maintains that it decided against immediate termination because "Floropoulos had, for five and a half years, been a good employee with no prior infractions, was a 'team player,' and was extraordinarily apologetic about the September 22, 2021 incident between Hamilton and him."  (TFSB 56.1 ¶ 40.)  Hamilton maintains TFSB "also decided not to terminate Floropoulos, in part, because Bader felt Floropoulos was 'a great guy.'  TFSB further advised [Hamilton] that he was liable for what occurred because Floropoulos was a manager at the bank and that Floropoulos should not lose his job for a 'victimless crime.'"  (Hamilton 56.1 ¶ 40.)

was being imposed on Floropoulos. (TFSB 56.1 ¶ 43; Hamilton 56.1 ¶ 43.) Hamilton was asked if TFSB could do anything more to make him feel comfortable, and he had no additional suggestions. (TFSB 56.1 ¶ 43; Hamilton 56.1 ¶ 43.)

In January 2022, Floropoulos returned to the office.[10] When Hamilton was informed that Floropoulos would be coming back to the office, Hamilton requested permission to work remotely from home, and TFSB granted that request. (TFSB 56.1 ¶ 47; Hamilton 56.1 ¶ 47.) Indeed, Hamilton never saw Floropoulos again (other than at a deposition taken in this case after Hamilton had resigned his employment with TFSB). (TFSB 56.1 ¶ 46; Hamilton 56.1 ¶ 46.) Since Floropoulos's return to work, there have been no further reports of any bad behavior, and Hamilton experienced no retaliation from Floropoulos for having reported the incident to his superiors.[11] (TFSB 56.1 ¶ 45; Hamilton 56.1 ¶ 45.)

On March 23, 2022, six months after the incident, Shawn Carson—Hamilton's supervisor—informed TFSB management that he no longer wished to work with Hamilton.[12] (TFSB 56.1 ¶ 48; Hamilton 56.1 ¶ 48.) Hamilton was informed of that fact, and TFSB offered him a mortgage banker assistant position in the Melville office with someone other than Carson. (TFSB 56.1 ¶ 49; Hamilton 56.1 ¶ 49.) But Hamilton declined the offer and resigned his employment

---

[10]     Upon learning that Bader had informed Floropoulos of his right to return, Willard texted Floropoulos: "Well I was wanting to give you the good news but apparently [Bader] did that already. Welcome back pal!!" (Ex. O, ECF No. 61-13.)

[11]     TFSB maintains that "Hamilton never thereafter felt either that his work environment at TFSB was hostile or that he suffered any other act while employed by TFSB that he would characterize as discriminatory." (TFSB 56.1 ¶ 45.) Hamilton disputes this, stating he "felt that TFSB did failed to take his complaint seriously because he did not suffer any physical injury[,] and it broke his trust in the system at TFSB. As a result, [Hamilton] felt uncomfortable working for the Melville office of TFSB. (Hamilton 56.1 ¶ 45.)

[12]     TFSB maintains (1) that Carson was dissatisfied with Hamilton's work; and (2) that Carson had tried for a long time, without success, to help Hamilton to improve. (TFSB 56.1 ¶ 48.) Hamilton maintains that he and Carson "had a disagreement about the quality of [Hamilton]'s work." (Hamilton 56.1 ¶ 48.) Hamilton further maintains that "upon Floropoulos's return to the office, Shawn Carson apologized to [Floropoulos] for the incident with [Hamilton] and for not enforcing the dress code." (Hamilton 56.1 ¶ 48.) Hamilton also maintains that Floropoulos "had conversations with Shawn Carson regarding [Hamilton]'s performance." (Hamilton 56.1 ¶ 48.)

with TFSB on March 25, 2022.  (TFSB 56.1 ¶ 49; Hamilton 56.1 ¶ 49.)  When the offer was presented to Hamilton, he was informed in writing that he would continue to be permitted to work remotely from home if he accepted the offer.  (TFSB 56.1 ¶ 49; Hamilton 56.1 ¶ 49.)

When TFSB hired Hamilton, TFSB gave him access to TFSB's employee handbook and instructed him to read it.  (TFSB 56.1 ¶ 50; Hamilton 56.1 ¶ 50.)  TFSB's employee handbook contains five single-spaced pages devoted to its anti-discrimination/harassment policy, along with instructions about whom complaints of discrimination or harassment should be made to.  (TFSB 56.1 ¶ 51; Hamilton 56.1 ¶ 51.)  Once or twice per year, TFSB employees are required to go through training on the bank's anti-discrimination/harassment policy.  (TFSB 56.1 ¶ 52; Hamilton 56.1 ¶ 52.)

Relevant here, the parties sharply dispute whether Floropoulos was Hamilton's supervisor at the time of the incident.  TFSB maintains that Floropoulos and Hamilton were co-workers, neither of whom had any supervisory authority over the other.  (TFSB 56.1 ¶ 26.)  TFSB further maintains that—at the time of the incident in question—Floropoulos's job had nothing to do with enforcing any dress code, and Hamilton knew that.[13]  (TFSB 56.1 ¶ 27.)  According to TFSB, Floropoulos's job was to sell mortgage loans and to supervise two or three other employees who were junior mortgage loan officers or mortgage banker assistants—none of whom were Hamilton. (TFSB 56.1 ¶ 28.)  Indeed, Hamilton was a mortgage banker assistant to Shawn Carson, who was another mortgage banker in the Melville office.  (TFSB 56.1 ¶ 29; Hamilton 56.1 ¶ 29.)  Hamilton had never reported to Floropoulos, so TFSB maintains that Floropoulos had no supervisory authority over Hamilton.  (TFSB 56.1 ¶ 26.)  TFSB contends that Floropoulos's job did not include

---

[13]     TFSB further maintains that Floropoulos never so much as mentioned TFSB's dress code policy during his tirade.  (TFSB 56.1 ¶¶ 23, 27.)

reprimanding Hamilton for anything, (TFSB 56.1 ¶ 30), and the two of them had never even worked together; they merely worked in the same office.  (TFSB 56.1 ¶¶ 26, 31.)

In response, Hamilton maintains that Floropoulos was his supervisor because—in a meeting with Bader following Hamilton's complaint—Bader purportedly told Hamilton that Floropoulos was his supervisor.  (Hamilton 56.1 ¶ 27.)  Hamilton further contends Floropoulos was his supervisor due to Bader's alleged statement that Hamilton was liable for what occurred because Floropoulos was a manager at TFSB.  (Hamilton Dep. Tr. 28:10–29:23.)  Hamilton also maintains Floropoulos is his supervisor because Floropoulos told him during the tirade: "[Y]ou come to the office, sneakers, jeans and a t-shirt, you're going home."  (Hamilton 56.1 ¶ 27.)

**B.**    **Procedural History**

On December 10, 2021, Hamilton commenced this action.  (ECF No. 1 ("Compl.").)  On October 26, 2022, Hamilton filed an amended complaint asserting six causes of action: (1) discriminatory hostile work environment against TFSB under 42 U.S.C. § 1981 (Count I); (2) discriminatory hostile work environment against TFSB under Title VII (Count II); discriminatory hostile work environment against TFSB and Floropoulos under the NYSHRL (Count III); discriminatory hostile work environment against TFSB and Floropoulos under the SCHRL (Count IV); common law assault against TFSB and Floropoulos (Count V); and common law battery against TFSB and Floropoulos (Count VI).  (Am. Compl. ¶¶ 23–57.)  Following the close of fact discovery, TFSB—and TFSB alone—moved for summary judgment on all six of Hamilton's claims.  (ECF No. 58.)

**II.**    **STANDARD OF REVIEW**

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); see also Johnson v. Killian, 680 F.3d 234, 236 (2d Cir.

2012) (per curiam).  Such a dispute qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex, 477 U.S. at 322–23); accord PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  Critically, however, all evidence must be viewed "in the light most favorable to the non-moving party," Overton v. N.Y. State Div. of Mil. & Naval Affs., 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," Sec. Ins. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," Anderson, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  Affidavits submitted in support of, or opposition to, summary judgment must be based on "personal knowledge," must "set out facts that would be admissible in evidence," and must "show that the affiant or declarant is competent to testify on the matters stated."  DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

## III.    DISCUSSION

As noted, Hamilton brings hostile work environment claims against TFSB under Title VII, Section 1981, the NYSHRL, and the SCHRL because of his race and sexual orientation.  Hamilton also brings common law assault and battery claims against TFSB and Floropoulos.  The Court will begin with Hamilton's federal hostile work environment claims and then turn to his state-law claims.

### A.    Federal Hostile Work Environment Claims

#### 1.    Title VII and § 1981

Hostile work environment claims, whether brought under Title VII or Section 1981, are assessed under the same standard.[14]  See Banks v. Gen. Motors, LLC, 81 F.4th 242, 261–62 (2d Cir. 2023).  "To state a claim for a hostile work environment under Title VII and Section 1981, a plaintiff must show that the complained-of conduct: (1) is objectively severe or pervasive; (2) creates an environment that the plaintiff … subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected characteristic]."[15]  Goins v. Bridgeport Hosp., 555 F. App'x 70, 71–72 (2d Cir. 2014) (citing Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (Title VII); Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 723–24 (2d Cir. 2010) (Section 1981)).  "In short, a plaintiff alleging a hostile work environment must

---

[14]    Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  "This section thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. Cnty. of Oneida, 375 F.3d 206, 224 (2d Cir. 2004); see also Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000) ("Section 1981 provides a cause of action for race-based employment discrimination based on a hostile work environment."); Williams v. N.Y.C. Hous. Auth., 61 F.4th 55, 69 (2d Cir. 2023) (analyzing hostile work environment claim under § 1981).  Title VII similarly prohibits a hostile work environment based on race: it provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see Toombs v. N.Y.C. Hous. Auth., 830 F. App'x 665, 667–69 (2d Cir. 2020) (analyzing hostile work environment claim under Title VII).

[15]    Section 1981 allows a claim for individual liability, whereas Title VII does not.  See Tolbert v. Smith, 790 F.3d 427, 434 n.3 (2d Cir. 2015).  Under Section 1981, an individual defendant may be held liable "only if that individual is personally involved in the alleged deprivation." Littlejohn, 795 F.3d at 314 (internal quotations and citation omitted).  Here, however, Hamilton brings a Section 1981 claim against TFSB only.  (Am. Compl. ¶¶ 23–26.)

demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal citation and quotation marks omitted).  Workplace incidents are objectively severe or pervasive enough to create a hostile work environment only if they ultimately "alter the conditions of [a plaintiff's] employment."  See Goins, 555 F. App'x at 72 (internal citations omitted); see also Baron v. Winthrop Univ. Hosp., 211 F. App'x 16, 17 (2d Cir. 2006) (internal citation and quotation marks omitted) (affirming grant of summary judgment for the employer because the complained-of conduct was "not sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment, so as to constitute a hostile work environment").  Relevant here, the Second Circuit has not held that "the one-time use of the slur 'n[****]r' by a supervisor to a subordinate can, by itself, support a claim for a hostile work environment."[16]  Daniel v. T&M Prot. Res., LLC, 689 F. App'x 1, at *2 (2d Cir. 2017). This court should consider the totality of the circumstances and factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance."[17]  Boonmalert v. City of New York, 721 F. App'x 29, 33 (2d Cir. 2018) (quoting Littlejohn, 795 F.3d at 320–21); Patane, 508 F.3d at 113.

---

[16]     See also Black v. Buffalo Meat Serv., Inc., 2022 WL 2902693, at *2 (2d Cir. Jul. 22, 2022) ("We have never held that the onetime use of a racial slur by a supervisor to a subordinate 'by itself, support a claim for a hostile work environment.'" (quoting Daniel, 689 F. App'x 1, at *2)); Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 724 (2d Cir. 2010) (finding that "a hostile work environment can also be established through evidence of a single incident of harassment that is extraordinarily severe" (internal quotation marks omitted)); cf., e.g., Albert-Roberts v. GGG Constr., LLC, 542 F. App'x 62, 64 (2d Cir. 2013) (affirming a district court's determination that a plaintiff's hostile work environment claims based on a co-worker using the word n*****r to plaintiff's husband outside her presence on one occasion and "occasionally moving cleaning supplies to make it difficult for plaintiff to do her job and implying that plaintiff was stealing cleaning supplies" did not "rise to the level of frequency or severity necessary to establish[ ] [a hostile work environment] claim").

[17]     The Second Circuit has stated that: "[w]hile the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable

Employers like TFSB are not automatically liable for improper workplace conduct by employees.  To hold an employer liable for such a hostile work environment, federal law requires the plaintiff to show "a specific basis for imputing the conduct creating the hostile work environment to the employer." Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013) (internal quotation marks omitted).  Two such bases exist: "[1] strict vicarious liability if an employer's supervisor has created the hostile environment; and [2] negligence if a co-worker who is not a supervisor has created the hostile environment, and the employer, upon becoming aware of the misconduct, fails to remedy it." Bentley v. Autozoners, LLC, 935 F.3d 76, 90–91 (2d Cir. 2019) (internal citations omitted).  The Court considers Hamilton's federal hostile work environment claims against TFSB on both theories.

a)   *Strict Vicarious Liability: Whether Floropoulos was Hamilton's Supervisor*

Hamilton argues that TFSB is strictly and vicariously liable for the hostile work environment created by Floropoulos because Floropoulos was his supervisor.  (Hamilton Opp. at 11–12.)  Assuming—solely for purposes of argument—that a reasonable jury could find that Floropoulos's allegedly racist and homophobic comments were "sufficiently severe or pervasive" as "to alter the conditions of [Hamilton's] employment and create an abusive working environment," the record evidence would not permit it to find that Floropoulos was Hamilton's supervisor. Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014) (internal quotation marks omitted).

As the Second Circuit has made clear, an employee is a "supervisor" for the purposes of vicariously liability under Title VII and Section 1981 only "when the employer has empowered

---

employee would find the conditions of her employment altered for the worse.'" Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (second alteration and emphasis in original) (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000)).

that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Bentley v. AutoZoners, LLC, 935 F.3d 76, 91 (2d Cir. 2019) (quoting Vance v. Ball State Univ., 570 U.S. 421, 431 (2013)).

"The ability to ... recommend discipline [is] not [a] tangible employment action[ ] within the meaning of Title VII" and Section 1981, nor is the "ability to distribute daily tasks." Dikambi v. City Univ. of N.Y., 690 F. Supp. 3d 293, 305 (S.D.N.Y. 2023) (Abrams, J.) (quoting Murphy v. Wappingers Cent. Sch. Dist., 2018 WL 1831847, at *7 (S.D.N.Y. Apr. 16, 2018) (citation omitted)); see Small v. Garland, 2021 WL 1226979, at *20 (S.D.N.Y. Mar. 31, 2021) ("Neither assigning tasks outside the plaintiff's job duties, distributing daily work assignments, recommending discipline to superiors, nor controlling an employee's hours and assignments within their job description have been held sufficient to establish supervisor status."); see also Vance, 570 U.S. at 439 (explaining that "the ability to direct another employee's tasks is simply not sufficient" to make one a supervisor). In Bentley v. AutoZoners, for example the Second Circuit considered whether a "sales manager" who allegedly harassed the plaintiff—who was a part-time sales associate—was the plaintiff's "supervisor" such that their employer was liable for his harassing conduct. 935 F.3d 76. Although the sales manager allegedly "threatened to cut [the plaintiff's] work hours, to send her home, and even to fire her," the Second Circuit noted that "there [was] no evidence" that he was ever empowered to take those actions. Id. at 92. And notwithstanding the testimony of a company district manager that the sales manager "had the authority to discipline [the plaintiff] if the circumstances warranted it," the court concluded he was not her "supervisor" for purposes of vicarious liability because he "could not ... alter her hours, or change her compensation" and thus "cause [her] economic injury." Id.

15

Consistent with those principles, to raise a triable issue of fact as to Floropoulos's status as a supervisor, Hamilton must adduce evidence showing that "[TFSB] had authorized [Floropoulos] to do more than oversee [his] day-to-day performance of assigned tasks." Id. at 91.  He has not done so.  Floropoulos's job was to sell mortgage loans and to supervise two or three other employees who were junior mortgage loan officers or mortgage banker assistants—none of whom were Hamilton.  (TFSB 56.1 ¶ 28.)  Indeed, as a mortgage banker assistant at TFSB's Melville office starting in July 15, 2016, Hamilton reported to Shawn Carson—i.e., his "immediate supervisor."  (TFSB 56.1 ¶ 32; Hamilton 56.1 ¶ 32.)  Hamilton and Floropoulos never even worked together; they merely worked in the same office.  (TFSB 56.1 ¶ 31; Hamilton TFSB 56.1 ¶ 31.)

Hamilton does not dispute these assertions.  Instead, he argues that Floropoulos was his supervisor because: (1) In a meeting following his complaint, Bader told him that "Floropoulos was [Hamilton's] supervisor," (Hamilton 56.1 ¶ 27); (2) In the same meeting, Bader told him that he was liable for what occurred because "Floropoulos was a manager at [TFSB]," (Hamilton Dep. Tr. 28:10–29:23); and (3) Floropoulos told him during the incident: "[Y]ou come to the office, sneakers, jeans and a t-shirt, you're going home,"  (Hamilton 56.1 ¶ 27).  In support of Bader's assertions, Hamilton—relying solely on his own deposition testimony—interprets Bader's remarks to mean that Floropoulos was his supervisor.  (Hamilton Dep. Tr. at Tr. 26:5–19 ("Based off of the meeting I had with [Bader], [Bader] stated [Floropoulos] was my supervisor, but I never reported to him."); 28:10–29:23 ("What I can remember off the  top of my head is … [Bader] stating that I am essentially liable because [Floropoulos] is a manager at the bank.").)  As for Floropoulos's comment about TFSB's dress code during the incident, Hamilton contends that such comment suggests Floropoulos possessed the ability to take a tangible employment action as a supervisor. (Hamilton Opp. at 11.)  But the strict vicarious liability standard under Title VII and Section 1981 is an objective one, and Hamilton's own belief that Floropoulos had the ability to take employment

16

action against him is insufficient to create a dispute of material fact.  See Del Villar v. Hyatt Hotel Corp., 2022 WL 2316205, at *6 (S.D.N.Y. June 28, 2022) (Furman. J.); see also Dikambi, 690 F. Supp. 3d at 306 (Abrams, J.).  To qualify as Hamilton's supervisor, Floropoulos had to have been authorized "to take tangible employment actions that could inflict direct economic injury." Bentley, 935 F.3d at 91 (emphasis in original).  Hamilton has presented no evidence that Floropoulos was empowered to do so.  Accordingly, he has failed to raise a triable issue of fact as to Floropoulos's status as his "supervisor" for the purposes of strict vicarious liability under Title VII and Section 1981.  See Vance, 570 U.S. at 437 n.9 (stating that employee's disciplinary or reassignment authority must have "economic consequences" for him to be identified as a supervisor).

b)    *Negligence: Whether TFSB Took Sufficient Remedial Action*

In the alternative, Hamilton argues that TFSB is vicariously liable for Floropoulos's conduct as a non-supervisory co-worker because it failed to take appropriate corrective action in response to Hamilton's complaints.  (Hamilton Opp. at 12–14.)  The Court again disagrees.

The Second Circuit has held that "[w]hen a 'co-employee'"—as distinct from a supervisor—is alleged to have engaged in harassing activity, the employer will generally not be liable for its own negligence unless it "failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."  Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013). Title VII and Section 1981 do not, however, "mandate that an employer take any particular remedial action, let alone take the plaintiff's preferred remedial action" in response to a complaint of harassment or discrimination.  Halkitis v. New York City Dep't of Educ., 2022 WL 392911, at *4 (S.D.N.Y. Feb. 9, 2022).  "Rather, [the remedial action] should be sufficiently calculated to end the harassment" or discrimination and "[e]ven a mere written warning can be an appropriate

response if it conveys the message that further harassment [or discrimination] will not be tolerated." Paul v. Postgraduate Ctr. for Mental Health, 97 F. Supp. 3d 141, 176 n.30 (E.D.N.Y. 2015) (quoting Wahlstrom v. Metro-N. Commuter R. Co., 89 F. Supp. 2d 506, 526 (S.D.N.Y. 2000)).  The "reasonableness" of an employer's response "depends among other things on the gravity of the harassment" or discrimination "alleged." Summa, 708 F.3d at 125 (quoting Torres v. Pisano, 116 F.3d 625, 638 (2d Cir. 1997)).

Applying those standards here, and drawing all permissible factual inferences in Hamilton's favor, the record evidence establishes that TFSB responded promptly and proportionately to Hamilton's complaints.  Hamilton contends that TFSB's response was deficient in multiple respects, and that a reasonable jury therefore could find in his favor.  The Court disagrees.

To begin, the parties agree that the TFSB provided an avenue for Hamilton's complaint. (TFSB 56.1 ¶¶ 50–52; Hamilton 56.1 ¶¶ 50–52.)  When TFSB hired Hamilton, TFSB gave him access to TFSB's employee handbook and instructed him to read it.  (TFSB 56.1 ¶ 50; Hamilton 56.1 ¶ 50.)  TFSB's employee handbook contains five single-spaced pages devoted to its anti-discrimination/harassment policy, along with instructions about whom complaints of discrimination or harassment should be made to.[18]  (TFSB 56.1 ¶ 51; Hamilton 56.1 ¶ 51.)  Indeed, once or twice per year, TFSB required its employees to go through training on the bank's anti-discrimination/harassment policy.  (TFSB 56.1 ¶ 52; Hamilton 56.1 ¶ 52.)  It is undisputed that

---

[18]     The handbook reads in relevant part:

> Any employee who has a question, concern, or complaint of discrimination or harassment based on race, color, sex, gender, religion, age, national origin, disability, pregnancy status, veteran status, sexual orientation, or other protected status is encouraged to bring the matter to the immediate attention of his or her supervisor, the Bank President or a member of management with whom the employee is comfortable disclosing such matters.

(Floropoulos Dep. Tr. at 17.)

Hamilton availed himself of TFSB's avenue for complaint when he reported the incident with Floropoulos to Shawn Carson (his immediate supervisor) and to Jerry Willard (the head of TFSB's Melville office) on the same evening it occurred.   (TFSB 56.1 ¶ 32; Hamilton 56.1 ¶ 32.) Accordingly, the Court concludes that no reasonable jury could find that the TFSB failed in this regard.

Turning to TFSB's response, the Court concludes no record evidence creates an issue of fact as to whether TFSB's action was prompt and effectively remedial.  See Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009) ("If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate.") (internal quotation marks omitted).

No reasonable jury could conclude that the TFSB failed to respond promptly.  Hamilton complained to Carson (his immediate supervisor) and to Willard (the head of TFSB's Melville office) on the same evening that the incident took place, September 22, 2021.  (TFSB 56.1 ¶ 32; Hamilton 56.1 ¶ 32.)  Bader—TFSB's Northeast Regional Senior Vice President—quickly became involved.  (TFSB 56.1 ¶ 33; Hamilton 56.1 ¶ 33.)  Before the workday began the following morning (on September 23, 2021), TFSB (1) arranged for Floropoulos to be absent from the office so that Hamilton would not have to interact with him; and (2) informed Hamilton of that fact.[19] (TFSB 56.1 ¶ 34.)  TFSB also quickly arranged for a video interview of Hamilton by Bader and Calk—the bank's Chairman and CEO (with authority over all the bank's around 45 loan production

---

[19]       Willard directed Floropoulos to contact Hamilton on the morning of September 23, 2021 and apologize, which he did by phone and text.  (Hamilton 56.1 ¶ 34.)  Hamilton testified that Floropoulos called him the morning after the incident, but he hung up immediately after answering the call and determining that it was Floropoulos. (Hamilton Dep. Tr. 57:17–21.)   Willard then texted Floropoulos: "Can you please send [Hamilton] a text to ask him to call you so you can apologize please."  (Ex. K, ECF No. 61-10.)  Floropoulos did so, texting Hamilton: "Hey Jason, if you can call me back [I'd] really appreciate it.  I'd like to apologize to you.  Please let me know.  Thank you.  Gus." (Ex. J, ECF No. 61-9.)   In the Court's view, Floropoulos's outreach—however unwise—does not change the promptness of TFSB's response to Hamilton's complaint.

offices); and (2) the head of the bank's Human Resources Department.  (TFSB 56.1 ¶¶ 35–36; Hamilton 56.1 ¶¶ 35–36.)  During the week following the September 22, 2021 incident, TFSB conducted an investigation that included Calk and Bader reviewing the audio-visual recording Hamilton made of most of the encounter, Willard reviewing footage from the building's security video camera, and Calk and Bader interviewing Hamilton and Floropoulos.[20]  (TFSB 56.1 ¶ 37; Hamilton 56.1 ¶ 37.)  Following its investigation, TFSB concluded that Floropoulos's conduct was improper (though not discriminatory) and, by September 30, 2021—just eight days after the incident—TFSB decided Floropoulos's discipline and informed both Hamilton and Floropoulos of its decision.  (TFSB 56.1 ¶ 39; Calk Dep. Tr. 49:19–22; 59:4–60:13.)

At bottom, the parties' dispute centers on whether the TFSB's response was adequate given Floropoulos's conduct.  In determining whether TFSB responded appropriately, the Court considers the seriousness of the conduct that Hamilton reported in his complaint together with TFSB's response.  See Distasio v. Perkin Elmer Corp., 157 F.3d 55, 65 (2d Cir. 1998) (explaining that courts consider "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment").  Here, TFSB took immediate and effectively remedial action in response to Hamilton's complaint, including: (1) arranging for Floropoulos to be absent from the office the day after the incident so that Hamilton would not have to interact with him; (2) making a decision on Floropoulos's discipline—after its high-level executives conducted an investigation—only eight days after the incident; (3) banning Floropoulos from the office for several months; (4) requiring Floropoulos, at his own expense, to enroll in and complete an anger management course; (5) requiring Floropoulos to apologize to the entire Melville office; (6) requiring Floropoulos to

---

[20]      And on September 27, 2021—five days after the incident—Hamilton met virtually with Bader and Calk to once more relay his complaint and to describe how he felt at work.  (Hamilton 56.1 ¶ 38.)

acknowledge and sign, in writing, that any further incident of a similar type would result in the immediate termination of his employment; and (7) requiring Floropoulos—upon his return to the office—to enter and leave by the back door of the office suite so that there would be no encounters between Floropoulos and Hamilton.  (TFSB 56.1 ¶¶ 34, 37, 39, 41, 43; Hamilton 56.1 ¶¶ 34, 37, 39, 41, 43.)   Indeed, Hamilton was informed of both (1) the discipline TFSB imposed on Floropoulos; and (2) the "back door" requirement TFSB imposed on Floropoulos.[21]  (TFSB 56.1 ¶¶ 39, 43; Hamilton 56.1 ¶¶ 39, 43.)  Further, just before Floropoulos was slated to return to the office, TFSB asked Hamilton if it could do anything more to make him feel comfortable; Hamilton had no additional suggestions.[22]  (TFSB 56.1 ¶ 43; Hamilton 56.1 ¶ 43.)  TFSB's measures appear to have worked.  Since September 22, 2021, there have been no further reports of any bad behavior by Floropoulos, Hamilton experienced no retaliation from Floropoulos for having reported the incident to his superiors, and Floropoulos and Hamilton never saw each other again (other than at a deposition taken in this case after Hamilton had resigned his employment with TFSB).  (TFSB 56.1 ¶¶ 45, 46; Hamilton 56.1 ¶¶ 45, 46.)

Hamilton contends that TFSB failed to exercise reasonable care in responding to Hamilton's complaint because, considering the totality the circumstances, TFSB's response was deficient in multiple respects.  (Hamilton Opp. 12–13.)  Even when considering the incident and TFSB's response cumulatively, the Court finds Hamilton has failed to establish a prima facie case of a hostile work environment based on race or sexual orientation.

Hamilton contends that TFSB's response was deficient for four reasons: (1) The correct response to Hamilton's complaint of discrimination would have been to fire Floropoulos,

---

[21]    It is undisputed Floropoulos completed each item set forth in TFSB's disciplinary memorandum.  (TFSB 56.1 ¶ 42; Hamilton 56.1 ¶ 42.)

[22]    This was after Hamilton requested permission to work remotely from home, and TFSB granted that request. (TFSB 56.1 ¶ 47; Hamilton 56.1 ¶ 47.)

(Hamilton 56.1 ¶ 57; Hamilton Dep. Tr. 80:11–24.);[23] (2) TFSB "[p]ermitting Floropoulos to work from home for over three months was a benefit as TFSB's policy was to require employee to work three days a week in the office," (Hamilton 56.1 ¶ 41; Hamilton Opp. 12.); (3) TFSB should not have awarded Floropoulos for his 2021 performance—given his punishment—by naming him to the "Chairman's Club" and gifting him a five-day, company paid trip to Peru with upper level TFSB management, (Hamilton Opp. 12.); and (4) TFSB's remedial admonishment of Floropoulos was "severely mitigated" by Bader's characterization of him as a "great guy," by Willard expressing his disappointment that he was not the one to first inform Floropoulos of the "good news" of his return to the office, and by Carson apologizing to Floropoulos—telling him that his own failure to enforce the dress code was to blame for Floropoulos's tirade, (Hamilton Opp. 13–14). Considering the incident and TFSB's response cumulatively, Hamilton's argument fails.

First, "[a]n employer's remedy need not necessarily expel the harasser from the work environment to be effective, but rather it should be sufficiently calculated to end the harassment." Dikambi, 690 F. Supp. 3d at 309 (Abrams, J.) (quoting Stepheny v. Brooklyn Hebrew Sch. for Special Child., 356 F. Supp. 2d 248, 266 (E.D.N.Y. 2005)). Indeed, the law "does not mandate that an employer take any particular remedial action, let alone the plaintiff's preferred remedial action." Halkitis, 2022 WL 392911, at *5. If it did, "employers may have no choice but to remove an alleged [discriminator or] harasser from his or her prior work environment any time a credible, but later unsubstantiated, accusation is made." Dagenais v. Wal-Mart Stores East, LP, 2024 WL 3520395, at *5 (D. Conn. Jul. 23, 2024). But, of course, "nothing requires an employer," as here, "to automatically fire one employee based on another's complaints." Scoppettone v. Mamma Lombardi's Pizzico, Inc., 523 F. App'x 73, 75 (2d Cir. 2013); see also De Silva v. Bluegreen Corp.,

---

[23]     Hamilton believes that he "most likely would not have resigned his employment with TFSB" had TFSB fired Floropoulos. (Hamilton 56.1 ¶ 57; Hamilton Dep. Tr. 80:11–24.)

1997 WL 727523, at *9 (N.D.N.Y. Oct. 7, 1997) ("[W]here the employer presents evidence of its prompt, remedial actions ... it is not enough for the plaintiff merely to point out ways in which she thinks the remedial actions could have been better or to point out how remedial actions did not meet her expectations." (internal quotation marks omitted)); Felty v. Regeneron Pharms., Inc., 2021 WL 860379, at *14 (S.D.N.Y. Mar. 8, 2021) ("Reasonableness in the employer's response, rather than perfection, is the standard imposed by law."). Accordingly, the Court finds Hamilton's first argument to be unavailing.

Second, Hamilton does not cite any evidence in the record to support his assertion that Floropoulos received a "substantial boon" from working remotely, as is his burden. FED. R. CIV. P. 56(c)(1)(A). In its own review, the Court also did not find any evidence in the record supporting this assertion. See FED. R. CIV. P. 56(c)(3). In fact, the only evidence in the record on the subject is that Calk, Bader, and Floropoulos all considered working from home to be punishment. (See TFSB's Rep. Br. 11 (citing relevant exhibits and deposition transcripts).) In any event, Title VII and Section 1981 do "not mandate that an employer take any particular remedial action, let alone take the plaintiff's preferred remedial action." Halkitis, 2022 WL 392911, at *5; Dikambi, 690 F. Supp. 3d at 307 (same); Dagenais, 2024 WL 3520395, at *5 (same). Hamilton's insistence that TFSB should have required Floropoulos to work in the office makes little sense given his call for Floropoulos's termination.

Third, that Floropoulos's sales results sufficiently qualified him for TFSB's annual Chairman's Club trip does not help Hamilton avoid summary judgment. See Halkitis, 2022 WL 392911, at *5 (holding that the law "does not mandate that an employer take any particular remedial action, let alone the plaintiff's preferred remedial action"); see also Dikambi, 690 F. Supp. 3d at 307 (same); Dagenais, 2024 WL 3520395, at *5 (same).

Finally, the scattershot of "severely mitigat[ing] factors Hamilton identifies above—however inappropriate they may be—similarly do not help him avoid summary judgment.  See Halkitis, 2022 WL 392911, at *5 (holding that the law "does not mandate that an employer take any particular remedial action, let alone the plaintiff's preferred remedial action"); see also Dikambi, 690 F. Supp. 3d at 307 (same); Dagenais, 2024 WL 3520395, at *5 (same).

In sum, the record makes clear that "[e]ach complaint that [Hamilton] brought directly to [TFSB's] attention was dealt with quickly and in proportion to the level of seriousness of the event."  Summa, 708 F.3d at 125.  Although regrettable if all Floropoulos's conduct occurred, no reasonable jury could find that TFSB acted negligently in failing "to take appropriate remedial action."  Duch, 588 F.3d at 762 (internal quotation marks omitted).  Therefore, the Court grants the TFSB's motion for summary judgment and dismisses Hamilton's Title VII and Section 1981 claims against it.

**B.      Supplemental Jurisdiction Under 28 U.S.C. § 1367**

Because the Court dismisses the only claims over which is it has original jurisdiction, the Court is inclined to decline to exercise supplemental jurisdiction over Hamilton's remaining NYSHRL, SCHRL, and common law assault/battery claims arising under New York state law.[24]

---

[24]      TFSB incorrectly asserts that the standards applicable to hostile work environment claims brought under the NYSHLR are identical to those that apply to hostile work environment claims under Title VII and Section 1981.  (See TFSB's Br. 18–19.)  That was the case "until recently."  Halkitis, 2022 WL 392911, at *7.  In August 2019, however, New York State amended the NYSHRL to broaden its liability standards governing conduct after its effective date.  See Deveaux v. Skechers USA, Inc., 2020 WL 1812741, at *3 n.3 (S.D.N.Y. Apr. 9, 2020) ("The NYSHRL was amended on August 19, 2019 to provide that its provisions should be construed liberally 'regardless of whether federal civil rights law, including those laws with provisions worded comparably to the provisions of this article, have been so construed.'") (quoting Act of Aug. 12, 2019, sec. 6, 2019 N.Y. Laws 160 (codified at N.Y. Exec. Law § 300 (2019))).  Specifically, the relevant provision of the NYSHRL, § 296(1)(h), was amended, effective October 11, 2019, to eliminate the requirement that harassing or discriminatory conduct be "severe or pervasive" for it to be actionable and to adopt instead a more protective standard that prohibits conduct that results in "inferior terms, conditions or privileges of employment."  Maiurano v. Cantor Fitzgerald Secs., 2021 WL 76410, at *3 n.2 (S.D.N.Y. Jan. 8, 2021) (quoting N.Y. Exec. Law § 296(1)(h)).  The amendment was signed in August 2019 and applies to claims occurring on or after October 11, 2019, without retroactive effect.  See McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020).  Here, the post-amendment version of the NYSHRL applies to Hamilton's NYSHRL claims because the incident in question occurred after the amendment's October 11, 2019 effective date.  See Edelman v. NYU Langone Health Sys., 2022 WL 4537972, at *14 (S.D.N.Y. Sept. 28, 2022).

See 28 U.S.C. § 1367(c).  The Court therefore directs Hamilton to show cause, within 7 days of entry of this Order, why the Court should not, in its discretion, decline to exercise supplemental jurisdiction over Hamilton's remaining state-law claims.  See Catzin v. Thank You & Good Luck Corp., 899 F. 3d 77, 82 (2d Cir. 2018).  If Hamilton does not comply with the Court's order, his remaining claims will be dismissed without prejudice.

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  As the Supreme Court stated in discussing § 1367's predecessor judicial doctrine of pendent jurisdiction, however, this is traditionally "a doctrine of discretion, not of plaintiff's right."  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).  Subsection (c) of § 1367 "confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise."  City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997).  Of relevance here, a district court "may decline to exercise supplemental jurisdiction" where "the claim raises a novel or complex issue of State law," id. § 1367(c)(1), and where "the district court has dismissed all claims over which it has original jurisdiction," id. § 1367(c)(3).  28 U.S.C. §§ 1367(c)(1), (3).

If a district court's discretion is triggered under § 1367(c)(1) or § 1367(c)(3), the court should balance the traditional "values of judicial economy, convenience, fairness, and comity," Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988), in deciding whether to exercise jurisdiction.  See Itar–Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 446–47 (2d Cir. 1998).  In weighing these factors, the district court is aided by the Supreme Court's additional guidance in Cohill that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the

remaining state-law claims." 484 U.S. at 350 n.7; see also Gibbs, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.... [I]f the federal law claims are dismissed before trial ... the state claims should be dismissed as well.").

This seems to be the "usual case" in which a plaintiff's state claims should be dismissed and refiled in state court "where they will be afforded a 'surer-footed reading of applicable law.'" Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 123 (2d Cir. 2006) (citing Cohill, 484 U.S. at 350 n.7). The judicial resources expended in this case do not appear to approach those that the Second Circuit has previously held justify pendent or supplemental jurisdiction after dismissal of all original-jurisdiction claims. Cf. Nowak v. Ironworkers Loc. 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996) (finding no abuse of discretion in exercise of jurisdiction over state claims where federal claim was dismissed only nine days before trial); Raucci v. Town of Rotterdam, 902 F.2d 1050, 1055 (2d Cir. 1990) (finding no abuse of discretion in exercise of jurisdiction over state claims despite dismissal of federal claim where discovery was completed, three dispositive motions were decided, and case was ready for trial). This case has been pending before this Court for about two and a half years, but only one dispositive motion—TFSB's motion before the court—has been addressed, and it was filed about six months ago. Additionally, the Court has set no trial date, and our Circuit has held dismissal of state-law claims to be proper even where one was imminent. Further, the Court can presently discern no "extraordinary inconvenience" or "inequity" occasioned by permitting Hamilton's state claims to be refiled in state court. See Kolari, 455 F.3d at 123–24. There, the claims may be afforded a "surer-footed reading of applicable law." Cohill, 484 U.S. at 350 n.7. Still, however, "insofar as a district under takes, sua sponte, the inquiry into whether to maintain supplemental jurisdiction [...], it must give the parties notice and an opportunity to be heard prior." Catzin, 899 F.3d at 84. This is because "[n]o principle is more

26

fundamental to our system of judicial administration than that a person is entitled to notice before adverse judicial action is taken against him." Lugo v. Keane, 15 F.3d 29, 20 (2d Cir. 1994) (per curiam).

With these precepts in the mind, Hamilton is ORDERED TO SHOW CAUSE within 7 days of the entry of this decision why this Court should not decline to exercise supplemental jurisdiction over his NYSHRL hostile work environment claim against Floropoulos, his SCHRL hostile work environment claim against TFSB, and his common law assault and battery claims against TFSB and Floropoulos. See Catzin, 899 F. 3d at 82. TFSB may respond within 7 days of Hamilton's filing. If the parties do not comply with the Court's order, Hamilton's remaining state-law claims will be dismissed without prejudice.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS TFSB's motion for summary judgment on Hamilton's Title VII and Section 1981 hostile work environment claims. Plaintiff is therefore ORDERED TO SHOW CAUSE within 7 days of the entry of this decision why this Court should not decline to exercise supplemental jurisdiction over his NYSHRL hostile work environment claim against Floropoulos, his SCHRL hostile work environment claim against TFSB, and his common law assault and battery claims against TFSB and Floropoulos. See Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 82, 86 (2d Cir. 2018) (emphasizing that declining to exercise supplemental jurisdiction sua sponte "without an opportunity to be heard is, at a minimum, bad practice in numerous contexts and is reversible error in others"). TFSB may respond within 7 days of Hamilton's filing. If the parties do not comply with the Court's order, Hamilton's remaining state-law claims will be dismissed without prejudice.

**SO ORDERED.**

Dated:    September 10, 2024
             Central Islip, New York

27

/s/ JMA

JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE